# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### *Richmond Division*

UNITED STATES OF AMERICA,

    And

THE COMMONWEALTH OF VIRGINIA,

    *ex rel. Plaintiff*

v.

[UNDER SEAL]

[UNDER SEAL]

[UNDER SEAL]

    *Defendants.*

Case No. 3:16cv767

**Amended Complaint for Violations of the Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1, *et seq.,* and the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.***

**FILED UNDER SEAL**

**JURY DEMAND**



RECEIVED

DEC 2 1 2016

CLERK, U S DISTRICT COURT
F_____ VA

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Richmond Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>And<br><br>THE COMMONWEALTH OF VIRGINIA<br><br>EX REL. MICHAEL HOCKADAY<br><br>    9422 Tracey Lynne Circle<br>    Glen Allen, VA 23060<br><br><br>    *Plaintiff,*<br><br>v.<br><br>NDUTIME YOUTH & FAMILY SERVICES, INC.<br><br>    6015 Staples Mill Road<br>    Richmond, VA 23228<br><br>    Registered Agent:<br><br>    Ellis O. Henderson<br>    6015 Staples Mill Road<br>    Henrico, VA 23228<br><br>TESHANA DENISE HENDERSON<br><br>    6015 Staples Mill Road<br>    Henrico, VA 23228<br><br>ELLIS O'NEILL HENDERSON<br>    6015 Staples Mill Road<br>    Henrico, VA 23228<br><br>    *Defendants.* | Case No. <u>**3:16-cv-727**</u><br><br>**Amended Complaint for Violations of the Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1, *et seq.*, and the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.***<br><br>**FILED UNDER SEAL**<br><br>**JURY DEMAND** |

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

## **FIRST AMENDED CIVIL COMPLAINT**

### **INTRODUCTION**

1.     Qui tam Relator Michael Hockaday ("Hockaday"), by and through counsel, individually and on behalf of the United Stated of America and the Commonwealth of Virginia files this complaint against Defendants NDUTIME Youth & Family Services, Inc. ("NDUTIME"), Teshana Henderson, and Ellis O. Henderson (hereinafter collectively referred to as "Defendants") to recover damages, penalties, and attorneys' fees for violations of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*, and the False Claims Act, 31 U.S.C. § 3729, *et seq.*

### **JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

3.     This Court has supplemental jurisdiction over the claims relating to the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*, because those claims are based on the same underlying nucleus of facts underlying the False Claims Act, 31 U.S.C. § 3729, *et seq.*, claims.

4.     This Court has personal jurisdiction over NDUTIME pursuant to 31 U.S.C. § 3732(a) because its principal place of business is within this judicial district and it conducts business within this judicial district.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and 28 U.S.C. 2732(a) because the complained of illegal acts giving rise to this action occurred within this judicial district and because NDUTIME's principal place of business is within this judicial district.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

3

## THE PARTIES

6.       Michael Hockaday is a citizen of the United States and a resident of Glen Allen, Virginia.

7.       Hockaday is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B) and states that his knowledge of the information contained herein has not been publicly disclosed.

8.       Hockaday began working at NDUTIME in March 2014.

9.       NDUTIME is a Virginia corporation with its principal office located in Henrico, Virginia.

10.      NDUTIME has three (3) locations in Virginia: Henrico, Richmond, and Emporia.

11.      NDUTIME is a community mental health organization that provides various mental health services primarily to Medicaid beneficiaries.

12.      Teshana Henderson is NDUTIME's Chief Administrative Officer and Chief Operating Officer, and is heavily involved in managing NDUTIME's day-to-day operations.

13.      Ellis Henderson is NDUTIME's Chief Executive Officer.

14.      Ellis and Teshana Henderson are husband and wife.

15.

## FACTUAL ALLEGATIONS

*Background*

16.      Medicaid is a partially federally funded health care program that is a cooperative undertaking between the federal government and state governments to help the states provide health care to low-income individuals.  The Medicaid program pays for services pursuant to

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v. NDUTIME Youth & Family Services, Inc., et al.*

4

plans developed by the states and approved by the United States Department of Health and Human Services Secretary through the Centers for Medicare & Medicaid Services. *See* 42 U.S.C. § 196a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and supplies of medical items and services according to established rates. The federal government then pays each state a statutorily established share of "the total amount expended...as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(a). This federal-to-state payment is known as Federal Financial Participation.

17.  Virginia provides Medicaid through a fee-for-service program and a managed care program called Medallion 3.0.

18.  Providers must adhere to all Virginia Medicaid policies and regulations.

19.  NDUTIME provides community based mental health services to Medicaid beneficiaries.

20.  NDUTIME provides the following services: intensive in-home counseling, therapeutic day treatment and after-school, therapeutic group homes, mental health skill building, supervised visitation, individual and family mentoring, parenting groups, supervised apartments, outpatient individual therapy, outpatient couples therapy, outpatient group therapy, outpatient family therapy, specialized direct supervision, substance abuse services, crisis intervention, crisis stabilization, sexual offender relapse, peer support groups, forgiveness and servant leadership training, and therapeutic consultation.[1]

---

[1] http://www.ndutime.org/?page_id=293

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

21.     Virginia Medicaid categorizes NDUTIME as a licensed clinical social worker

provider specializing in developmental disabilities (DD):[2]



22.     Ellis Henderson is NDUTIME's Chief Executive Officer.

23.     Teshana Henderson is NDUTIME's Chief Administrative Officer and Chief

Operating Officer.

24.     Teshana Henderson is directly and heavily involved in the day-to-day operations

of NDUTIME.

25.     Teshana Henderson is a member of Virginia's Governor's Taskforce on Improving

Mental Health Services and Crisis Response, which focused on expanding access to,

strengthening administration, and improving quality the of Virginia's mental health services.[3]

26.     Instead of expanding access to individuals in need of mental health services and

improving the quality of mental health services, NDUTIME takes advantage of vulnerable

---

[2]
https://www.virginiamedicaid.dmas.virginia.gov/wps/portal/!ut/p/c5/hY5Rj4IwEIR_i79g11KB10oJNFmsQL0DXkg
T9SJ5kUSCwq-
_mtyrd7Nv82V2Bhpw19vp8mXHy62331BB47eaJeGaa0yQexIVSUZkOGLoO177bZSIIAfkDBVxVHyrCxZrROX9k_6
ECnlbduGQzWNFSzSZbsnZrrPzSDneF_HIRrk_fhSHrRC9padxmeb1Ncoop6BgiEa6zlJnSgfood788j82vTi-
kUDYpbfrCWpogrfbXYuBOobhepiG-CxzsVr9AMZh2dA!/
[3] http://www.dbhds.virginia.gov/library/mental%20health%20services/omh-mhtaskforce-final-report-oct2014.pdf

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.
NDUTIME Youth & Family Services, Inc., et al.*

6

Medicaid beneficiaries in an effort to generate maximum profits by defrauding the Commonwealth and the federal government.

27.     Hockaday received an associate degree in social science from Reynolds Community College in 2003 and a bachelor's degree in psychology from the Virginia Commonwealth University in 2005.

28.     Hockaday also is credentialed as a Qualified Mental Health Professional ("QMHP").

29.     Hockaday has worked in the mental health field since January 2006.

30.     Hockaday began working at NDUTIME in March 2014 as a Crisis Counselor.

31.     In July 2014, NDUTIME promoted Hockaday to Lead Crisis Counselor.

32.     Hockaday currently works at NDUTIME as its Lead Crisis Counselor.

33.     Hockaday's direct supervisor is Teshana Henderson.

34.     Hockaday's co-supervisor for NDUTIME's Crisis Department is Shalanda Jackson ("Jackson") who is a Licensed Clinical Social Worker ("LCSW").

35.     Jackson oversees six (6) Crisis Counselors.

***Specific Provider Intakes (Assessments)***

36.     On January 29, 2015, Virginia enacted revisions to Virginia Administrative Code Title 12, Agency 30, Chapter 50.

37.     In part, the regulations changed the certifications required for an individual provider to conduct a service specific provider intake (formerly referred to as an assessment), which is a "face-to-face interaction" where the provider obtains information from the individual seeking services about the individual's mental health status including the "documented history of

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

7

the severity, intensity, and duration of mental health care problems and issues" with all of the

following elements:

    i.    The presenting issue/reason for referral,
    ii.    Mental health history/hospitalizations,
    iii.    Previous interventions by providers and timeframes and response to treatment,
    iv.    Medical profile,
    v.    Developmental history including history of abuse, if appropriate,
    vi.    Educational/vocational status,
    vii.    Drug and alcohol profile,
    viii.    Resources and strengths,
    ix.    Mental status exam and profile,
    x.    Diagnosis,
    xi.    Professional summary and clinical formulation,
    xii.    Recommended care and treatment goals,
    xiii.    The dated signature of the LMHP, LMHP-supervisee, LMHP-resident, or LMHP-RP. 12 V.A.C. 30-50-226; 12 V.A.C. 30-50-130.

38.    Under the new regulations, *only* the following can perform a service specific

provider intake:

    i.    Licensed Mental Health Professional ("LMPH"), which "means a licensed physician, licensed clinical psychologist, licensed professional counselor, licensed clinical social worker, licensed substance abuse treatment practitioner, licensed marriage and family therapist, or certified psychiatric clinical nurse specialist."

    ii.    LMHP-Resident (often referred to as LMHP-R)

    iii.    LMHP-Resident in Psychology (often referred to as LMHP-RP)

    iv.    LMHP-Supervisee in Social Work (often referred to as LMHP-RP)

    v.    Certified Pre-screener, which "means an employee of the local community services board or behavioral health authority, or its designee, who is skilled in the assessment and treatment of mental illness and has completed a certification program approved by the Department of Behavioral Health and Developmental Services." 12 V.A.C. 30-50-226.

39.    Notably, the new regulations *changed to disallow* Qualified Mental Health

Professionals ("QMHP") and QMHP-Eligibles from conducting specific provider intakes

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

8

(assessments) because QMHPs are not permitted by their licenses to conduct diagnostic activities, which is what a specific provider intake does. Rather, QMHPs are permitted to render services *after* a licensed professional (any LMHP or certified pre-screener) has determined the individual's diagnosis.[4]

40.     A QMHP is "a person in the human services field who is trained and experienced in providing psychiatric or mental health services to individuals who have a mental illness," including a person with a "bachelor's degree in human services or a related field (social work, psychology, psychiatric rehabilitation, sociology, counseling, vocational rehabilitation," or human services counseling) and "at least one year of clinical experience." 12 VAC30-50-226; 12VAC35-105-20.

41.     Since the new regulations have gone into effect, NDUTIME has failed to comply with the prescribed requirements.

42.     NDUTIME is still not currently complying with regulations regarding specific provider intakes.

43.     Teshana Henderson is aware that Hockaday and other similarly certified QMHPs are legally unable to complete specific provider intakes, but nonetheless requires Hockaday and other QMHPs to complete specific provider intakes.

44.     NDUTIME requires that employees who are not licensed as any type of LMHP or Certified Pre-Screener to conduct the service specific provider intakes.

---

[4]

http://townhall.virginia.gov/L/GetFile.cfm?File=C:\TownHall\docroot\64\3469\6536\AgencyStatement_DMAS_65 36_v5.pdf at 13.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.
NDUTIME Youth & Family Services, Inc., et al.*

9

45.     At NDUTIME, Counselors who are not LMHPs or Certified Pre-Screeners conduct the specific provider intakes.

46.     Hockaday is not an LMHP or Certified Pre-Screener, but is a QMHP.

47.     Since the new regulations have gone into effect on January 29, 2015, Hockaday continued to provide a majority of the specific provider intakes for individuals seeking services at NDUTIME.

48.     Since the new regulations have gone into effect on January 29, 2015, Teshana Henderson has demanded and required that Hockaday and other non-LMHPs and Certified Pre-Screeners to conduct specific provider intakes.

49.     Hockaday continued to provide the majority of specific provider intakes up through May 2016.

50.     In order to make it look like NDUTIME is performing the specific provider intakes in compliance with the regulations, Hockaday and other unqualified employees who are improperly performing the specific provider intakes, electronically sign for qualified employees (LMHPs), and then email the completed specific provider intake forms to employees who are licensed to complete the specific provider intakes.

51.     The licensed employees add their signatures to the service specific provider intake forms to make it look as if they met with the patient themselves and completed the form.

52.     NDUTIME has licensed employees add their signatures to the service specific provider intake forms because Teshana Henderson and NDUTIME management know that if the specific provider intake is not performed by a licensed provider then NDUTIME will not receive any reimbursement from Medicaid.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

10

53.     Unqualified employees like Hockaday never sign their own names on the service specific provider intake forms because Medicaid will not reimburse NDUTIME for services if the service specific provider intake is not performed by an LMHP or Certified Pre-Screener.

54.     Teshana Henderson has specifically instructed non-QMHPs like Hockaday to complete the specific provider intakes, but to not sign their names to their work so as to make it appear as if the specific provider intakes were completed by a LMHP or Certified Pre-Screener.

55.     For example, on March 6, 2015 Hockaday completed a specific provider intake for Robert C and emailed it Chartrice Thorne, NDUTIME's Director of Clinical Services and an LMHP:

-----Original Message-----
From: Chartrice Thorne
Sent: Friday, March 06, 2015 1:16 PM
To: Michael Hockaday
Subject: RE: Emporia TDT/IIH Assessment NEW

Assessment looks good. The addendum was finalized with no revisions needed. Did you complete a preliminary ISP for R. C███?

-----Original Message-----
From: Michael Hockaday
Sent: Thursday, March 05, 2015 9:45 PM
To: Chartrice Thorne
Subject: Emporia TDT/IIH Assessment NEW
Importance: High

Here is the assessment for R C███who I completed today. (The other parent rescheduled for Tuesday due to the weather). This is my first time doing a full assessment for TDT/IIH so you might want to look it over before sending to clinical reports. Although VICAP did not recommend either service (they also did not provide an Axis I diagnosis) I think there is enough there to submit it anyway Let me know what you think

Also, did you send the addendum for P███to Clinical reports? I have not received any revisions

Thanks,

Michael Hockaday, BS, QMHP
Lead Crisis Counselor
Residential Crisis Stabilization Program

56.     Likewise, Hockaday completed a specific provider intake for Cierra B.:

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

11

| | |
|---|---|
| **From:** | Michael Hockaday </o=NYFS/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=mhockaday> |
| **Sent:** | Thursday, August 27, 2015 10:07 AM |
| **To:** | Clinical Reports <ClinicalReports@ndutime.org> |
| **Cc:** | Crisis Documentation <CrisisDocumentation@ndutime.org> |
| **Subject:** | C B█████RCS Assessment 8_25_15 |
| **Attach:** | C B█████RCS Assessment 8_25_15.doc |

Ding-ding!!! We have a winner!  Longest Assessment I have done to date.  PS – sorry did not send yesterday.  Was going to proofread when I got home last night but would not download from my email.

*Michael Hockaday, BS, QMHP*
**Lead Counselor, Residential Crisis Stablization**
**NDUTIME Youth & Family Services, Inc.**

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

**<u>Results of Assessment:</u>**

*Action Taken:*

    X Based on the above information and collected data, Cierra is appropriate for the program and will be admitted.

    ☐ Based on the above information and collected data, Applicant is appropriate for the program, but LAR withdrew application.

    ☐ Based on the above information and collected data, Applicant is not appropriate for the program. Applicant will be referred to a higher level of care.

    ☐ Based on the above information and collected data, Applicant is not appropriate for the program. Applicant will be referred to a lower level of care.

- Referral Source: ___Cierra B█████(self)___

  Address: _None___  Phone: _None___  Fax: _None_

| | | | |
|---|---|---|---|
| • Called to thank Referral Source within 24 hours? | | YES | NO |
| If no, reason: _____Thanked in person_____ | | | |
| • Thank you letter mailed to Referral Source: | | YES | NO |
| If no. reason: _Thanked in person_____ | | | |
| • Date entered into Database: _____August 25, 2015_____ | | | |
| • Assessed within 48 hours of call? | | YES | NO |
| If no, reason: _____ | | | |
| • Treatment Recommendation made to Client: | | YES | NO |
| If no, reason: _____ | | | |

---

**Initial Plan:** Cierra is eligible and recommended for Residential Crisis Stabilization Services  _X_ YES
___ NO

**Case Start Date:** _Aug. 25, 2015___  **Case End Date:** _Sept. 8, 2015_____     **Hours/week:** __40-50___

**Staff Assigned:** _____To Be Determined_____

**Pre-Screening Completed By:** _Shalanda Jackson, MSW, LCSW___ . .     **Date:** __August 25, 2015_____

**Clinical Director/Reviewer:** _____     **Date:** _____

---

57.      For example, Hockaday completed a specific provider intake for Amanda A,

which he emailed to Thorne and Powell.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

13

| From: | Michael Hockaday </O=NYFS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MHOCKADAY> |
|---|---|
| Sent: | Friday, October 30, 2015 3:47 PM |
| To: | Chartrice Thorne <CThorne@ndutime.org> |
| Cc: | Melissa Powell <MPowell@ndutime.org> |
| Subject: | ▆▆▆MHSB Assessment |
| Attach: | A ▆▆▆▆MHSB Assessment - Emporia.doc |

Here is the completed assessment for Amanda. Sorry it took so long but as you know we've been a bit busy and stretched pretty thin.

Thanks,

Michael Hockaday, BS, QMHP
Lead Crisis Counselor
Residential Crisis Stabilization Program

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

## Results of Assessment:

**Action Taken:**

X Based on the above information and collected data, Amanda is appropriate for the program and will be admitted.

☐ Based on the above information and collected data, Applicant is appropriate for the program, but LAR withdrew application.

☐ Based on the above information and collected data, Applicant is not appropriate for the program. Applicant will be referred to a higher level of care.

☐ Based on the above information and collected data, Applicant is not appropriate for the program. Applicant will be referred to a lower level of care.

- Referral Source: ____Amanda A█████(self)_____

  Address: _____Phone: _____Fax: _____

- Called to thank Referral Source within 24 hours?          **YES**          NO
  If no, reason: _____

- Thank you letter mailed to Referral Source:          YES          **NO**
  If no, reason: ____Thanked in person_____

- Date entered into Database: _____

- Assessed within 48 hours of call?          **YES**          NO
  If no, reason: _____

- Treatment Recommendation made to Client:          **YES**          NO
  If no, reason: _____

---

**Initial Plan:** Amanda is eligible and recommended for Mental Health Skill Building Services: X_ YES ____ NO

| | | |
|---|---|---|
| Case Start Date: _____ | Case End Date: _____ | Hours/week: _8 – 10 hours/week_ |
| Staff Assigned: _____ **TBD** | | |
| Pre-Screening Completed By: Shalanda Jackson, LCSW | Date: _October 27, 2015_ | |
| Clinical Director/Reviewer: _____ | Date: _____ | |

---

58.     NDUTIME often requests that Hockaday perform specific provider intakes for multiple offices:

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.
NDUTIME Youth & Family Services, Inc., et al.*

| From: | Chartrice Thorne <CThorne@ndutime.org> |
|---|---|
| Sent: | Tuesday, February 24, 2015 6:00 PM |
| To: | Michael Hockaday <mhockaday@ndutime.org> |
| Cc: | Leah Hardy <LHardy@ndutime.org>; Melissa Powell <MPowell@ndutime.org>; Shalanda Jackson <SJackson@ndutime.org> |
| Subject: | FW: Assessment |

Mr. Hockaday,

Please send multiple dates to Mrs. Powell and Mrs. Hardy that you can go to Emporia to assist with assessments and/or addendums. She has one parent that went to VICAP on 2/20/15 and two more going to the VICAP assessment next week. Please give her several dates.

Thanks so much!

*Chartrice Thorne*, LCSW, CSOTP
**Director of Clinical Services**
**NDUTIME YOUTH & FAMILY SERVICES, INC.**

| From: | Chartrice Thorne <CThorne@ndutime.org> |
|---|---|
| Sent: | Wednesday, November 11, 2015 3:33 PM |
| To: | Michael Hockaday <mhockaday@ndutime.org> |
| Subject: | RE: Daz J█████TDT Emporia Assessment & Pre ISP 9/8/14 - Final |

Sometime next week is good. Full assessment.

-----Original Message-----
From: Michael Hockaday
Sent: Wednesday, November 11, 2015 3:14 PM
To: Chartrice Thorne <CThorne@ndutime.org>
Subject: RE: Daz Johnson TDT Emporia Assessment & Pre ISP 9/8/14 - Final

I am assuming that these are in Emporia clients that I need to do the assessments for but I have a couple of questions. First, do they need a full assessment or addendum? Second, is there a deadline for getting these done? I am on my way to get this new one completed and am scheduled to see a client in the community tomorrow so I am not sure when I will have the time to get all of these typed up. Please let me know.

Thanks,

Michael Hockaday, BS, QMHP
Lead Crisis Counselor
Residential Crisis Stabilization Program

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

16

| | |
|---|---|
| **From:** | Chartrice Thorne <CThorne@ndutime.org> |
| **Sent:** | Tuesday, November 17, 2015 3:03 PM |
| **To:** | Leah Hardy <LHardy@ndutime.org>; Eron Cavanaugh <ECavanaugh@ndutime.org>; Melissa Powell <MPowell@ndutime.org>; Shalanda Jackson <SJackson@ndutime.org>; Michael Hockaday <mhockaday@ndutime.org> |
| **Subject:** | RE: Emporia Assessments Update??? |

Mr. Cavanaugh, please forward me the completed assessments immediately!!! This is time sensitive.

——Original Message——
From: Leah Hardy
Sent: Tuesday, November 17, 2015 2:51 PM
To: Chartrice Thorne <CThorne@ndutime.org>; Eron Cavanaugh <ECavanaugh@ndutime.org>; Melissa Powell <MPowell@ndutime.org>; Shalanda Jackson <SJackson@ndutime.org>; Michael Hockaday <mhockaday@ndutime.org>
Subject: RE: Emporia Assessments Update???
Importance: High

T. H■■■■ was 10/23/2015 - he has already been assessed. Assessed by Mr. Hockaday.
R. J■■■■ was 10/26/2015 - she has been assessed by Mr. Cavanaugh.
G. E■■■ was 10/8/2015 - she has been assessed by Mr. Hockaday.
K. G■■■■ was 10/29/2015 - he was assessed by Mr. Cavanaugh.

The ones that will need to be scheduled are:
J. M■■■ - went 11/14/2015
M. S■■■ - went 11/14/2015 (he is the younger brother to J. M■■■) A. B■■■■ - goes on 11/18/2015 D. P■■■■ - goes on 11/20/2015 T. G■■■■ - goes on 11/20/2015 S. P■■■■ - goes on 11/20/2015

——Original Message——
From: Chartrice Thorne
Sent: Tuesday, November 17, 2015 2:24 PM
To: Eron Cavanaugh <ECavanaugh@ndutime.org>; Melissa Powell <MPowell@ndutime.org>; Leah Hardy <LHardy@ndutime.org>; Shalanda Jackson <SJackson@ndutime.org>; Michael Hockaday <mhockaday@ndutime.org>
Subject: RE: Emporia Assessments Update???
Importance: High

I definitely need those immediately...I can't submit the SRA for services without them...where did you send them?

Whenever you complete assessments for other programs, you have to send them to the Directors and supervisors of those programs.

59.     Additionally, often NDUTIME does not complete the specific provider intake

forms at the beginning of service as required.

60.     When NDUTIME fails to complete specific provider intake forms at the

beginning of service, it creates false forms and then backdates them.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

**RE: Client Coverage**
Michael Hockaday

Sent: Sunday, May 01, 2016 1:58 PM
To: Shalanda Jackson
Cc: Chartrice Thorne

I will do the assessment as requested, however, I think we are
taking way too many chances waiting until Day 4 of services before
an assessment is completed.  I think it would be a good idea if we
come up with a plan to address this in the future in order to avoid
the potential for consequences from Licensure or DMAS.

Thanks,

Michael Hockaday, BS, QVHP
Lead Crisis Counselor
Residential Crisis Stabilization Program

61.    Chartrice Thorne, who is the Director of Clinical Services and an LMHP, has

asked Hockaday to complete multiple "assessments" or "addendums" (specific provider intake

forms) for patients who already began treatment.

62.    Therefore, NDUTIME management not only knowingly directs non-LMHPs to

complete specific provider intake forms, but also directs non-LMHPs to falsify non-compliant

intakes by back-dating them.

| | |
|---|---|
| **From:** | Chartrice Thorne <CThorne@ndutime.org> |
| **Sent:** | Friday, April 24, 2015 6:52 PM |
| **To:** | Melissa Powell <MPowell@ndutime.org> |
| **Cc:** | Michael Hockaday <mhockaday@ndutime.org> |
| **Subject:** | addendums |

Mrs. Powell,

Mr. Hockaday will be down next week to complete the needed addendums for the month of
April for TDT. I believe there are 2 or 3.

Thanks so much!

*Chartrice Thorne*, LCSW, CSOTP
**Director of Clinical Services**
**NDUTIME YOUTH & FAMILY SERVICES, INC.**

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

18

63.     Once Hockaday completed the specific provider intake forms, Thorne signed and backdated them to make it appear as if they were performed prior to beginning services in compliance with the regulations

64.     Thorne signed and backdated these forms so that NDUTIME would receive reimbursements from Medicaid.

65.     Many of the specific provider intake forms that Hockaday completed were overdue by more than one month.

66.     NDUTIME had already started to bill Medicaid for treatment of many patients before requesting that Hockaday complete "addendums" (specific provider intake forms) for those patients.

67.     For example, on December 3, 2015, Powell sent Hockaday a list of fourteen (14) individuals who were receiving services from NDUTIME, but never had a specific provider intake performed.

| From: | Melissa Powell <MPowell@ndutime.org> |
|---|---|
| Sent: | Thursday, December 3, 2015 10:57 AM |
| To: | Odessa Brittenum <obrittenum@ndutime.org>; Michael Hockaday <mhockaday@ndutime.org> |
| Cc: | Chartrice Thorne <CThorne@ndutime.org> |
| Subject: | Back log of Addendums |
| Attach: | Back Log of Addendums to be completed.docx |

Good morning,

Please find attached a list containing all back logged addendums.

Melissa Powell, QMHP
Coordinator of Community Base Services
NDUTIME Youth and Family Services, Inc.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

**Back Log of Addendums to be completed**

T. W█████ – 6/20/2015

M. S████ – 9/27/13

N. W███ – 10/18/13

J. T██ – 10/24/14

T. P██ – 10/27/14

N. P███ – 10/27/14

S. H███ – 10/27/10


L W███ – 11/1/12

A. T███ – 11/29

I. E█████ – 11/20/14

J. F██ – 11/11/13

J. W███ – 11/2/14

J. B████ – 11/19/13

A. C█████ – 11/12/14

68.    Based on the December 3, 2015 list, Hockaday was supposed to fill out the specific provider intake forms and backdate them.

69.    When specific provider intakes did not include sufficient detail to support services, NDUTIME would edit and revise them.

70.    Thorne often added additional information to specific provider intakes to ensure that the documentation would support reimbursement from Medicaid.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

20

| From: | Chartrice Thorne <CThorne@ndutime.org> |
|---|---|
| Sent: | Monday, November 16, 2015 4:05 PM |
| To: | Michael Hockaday <mhockaday@ndutime.org>; Melissa Powell <MPowell@ndutime.org> |
| Subject: | RE: G. E████ |

I don't personally have a problem with assessment, however Magellan review is very subjective. I will review and reword and/or add information and send it to you to add to the assessment.

Thanks so much!

71.     NDUTIME was acutely aware of the regulations changes affecting who could provide services, including what certifications an individual provider must have in order to perform the specific provider intakes.

72.     NDUTIME is also acutely aware of the fact that specific provider intakes must be completed at the beginning of treatment, not long after treatment has begun.

73.     Nonetheless NDUTIME bills the Government for treatment as if the specific provider intakes were completed at the beginning of treatment.

74.     NDUTIME itself and multiple members of its staff provided public comments on the regulations.

75.     NDUTIME commented on the regulatory changes, voicing strong opposition to them:[5]

---

[5] http://townhall.virginia.gov/L/viewcomments.cfm?commentid=37870

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

**Agency** / **Department of Medical Assistance Services**

**Board**   **Board of Medical Assistance Services**

**Chapter**

Amount, Duration, and Scope of Medical and Remedial Care and Services [12 VAC 30 - 50]

| Action | 2011 Mental Health Services Program Changes for Appropriate Utilization & Provider Qualifications |
|---|---|
| Stage | Final |
| Comment Period | Ends 1/29/2015 |

Previous Comment    Next Comment    Back to List of Comments

**Commenter: NDUTIME Youth and Family Services Inc. \***                                    1/29/15  6:14 pm

**Proposed Changes to Crisis Intervention Services**

I am strongly opposed to your changes regarding Crisis Intervention Services. Specifically, the proposal to limit services to only be provided by LMHP's and License Eligible individuals will significantly hinder our ability to provide services to all individuals in need crisis intervention. This change will be detrimental to current clients and future clients who are in need of our services. Furthermore, this change is a discredit to all the QMHP's currently providing outstanding crisis intervention services and could potentially damage their job standing. I urge you to reconsider these proposed changes for the sake of both clients and providers. Thank you for your consideration.

76.    Chartrice Thorne, Director of Clinical Services at NDUTIME, commented, noting several concerns with the proposed regulatory changes:[6]

---

[6] http://townhall.virginia.gov/L/viewcomments.cfm?commentid=37875

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

22

| Action | 2011 Mental Health Services Program Changes for Appropriate Utilization & Provider Qualifications |
|---|---|
| Stage | Final |
| Comment Period | Ends 1/29/2015 |

Previous Comment    Next Comment    Back to List of Comments

Commenter: Chartrice Thorne, NDUTIME Youth & Family Services, Inc. *                1/29/15  7:33 pm

**Concerns with the proposed changes**

I have several concerns with the proposed changes:

1. Considering the need for Crisis Intervention services across the state, it seems unrealistic to ONLY have an LMHP, LMHP-supervisee, LMHP-resident, LMHP-RP, or certified prescreener to provide services to individuals that may need Crisis Intervention services. A trained QMHP can provide quality services to an individual and/or family that is need of Crisis Intervention services. Additionally, if the proposed changes are adopted there will not be enough qualified people to meet the needs of the community.

2. Case Management activities are an integral component of IIH services and should not be removed based on the importance of ensuring services are provided from an holistic approach.

3. There seems to be a conflict with the proposed changes for TDT services, on page 603 #4 it states that the intake shall be conducted by the LMHP, however on page 603 #13 it states that the intake can be conducted by an LMHP, LMHP-supervisee, LMHP-resident, or LMHP-RP. Please clarify.

4. It is not always possible to have documentation of repeated interventions at the time of assessment.  It is not realistic to expect the provider to obtain documentation of repeated interventions at the of assessment, especially since often times individuals in need of mental health services are poor historians and do not keep accurate records/documentation. If this becomes a requirement, what type of documentation will be acceptable and how should the provider attempt to obtain this document at the time of assessment and remain in compliance with regulations as it pertains to completing the assessment. Will documentation of repeated interventions be required at the time of the VICAP assessment prior to the recommendation of services?

Respectfully Submitted,

Chartrice Thorne


77.    Pamela Hagues, Director of Clinical Services at NDUTIME until approximately

February 2016, commented, expressing concerns and disagreement with the proposed changes:[7]


Commenter: Pamela Hagues, NDUTime *                1/29/15  11:08 pm

**Concerns with Proposed Regulations**

As a Community Based Provider, I disagree with the IIHS Proposed Changed. I believe Case Management should not be removed as one of the duties and responsibilities of IIHS workers; they are more than capable and qualified to render this service effectively.

---

[7] http://townhall.virginia.gov/L/viewcomments.cfm?commentid=37882

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.
NDUTIME Youth & Family Services, Inc., et al.*

78. Ryshonna Stith, Human Resources Director at NDUTIME, also commented, expressing her agreement with other commenters who voiced concerns and disagreement with the proposed changes:[8]

| Action | 2011 Mental Health Services Program Changes for Appropriate Utilization & Provider Qualifications |
|--------|----------|
| Stage | Final |
| Comment Period | Ends 1/29/2015 |

Previous Comment    Next Comment    Back to List of Comments

Commenter: Ryshonna Stith, NDUTIME Youth & Family Services, Inc. *                    1/29/15 8:34 pm

**Proposed Regulations**

I agree with all comments that have been posted prior to mine pertaining to the many irregularities in the proposed regulations.

However, as a Human Resources Director, many of the proposed regulations have a tremendously adverse impact on employees and the clients we service. In efforts to develop compassionate, caring, and clinical staff, the regulations continue to make it virtually impossible to identify and employ qualified mental health professionals. Many candidates invest in their education with degrees that "qualify" them as a QMHP, IF they have 1 year clinical experience. Many programs do not require internships or practicuums as a part of completion of the program. Therefore, many candidates seek out their own clinical experiences in hopes of becoming a qualified mental health professional. The language in the proposed regulations indicates that "unsupervised" internships, practicums, or field experiences do not meet the requirements. This industry overall is extremely competitive. Since the regulation changes in 2010, it has become even more challenging to hire and retain quality staff. Often, there are compassionate, caring, and knowledgeable staff who are unable to succeed in the industry due to strict regulations. Unfortunately, the industry is also saturated with many "qualified" professionals who do not provide quality service and still make it through the doors of many agencies that are desparately plagued with vacancies. With millenials entering the workforce, it is unfair to disqualify an individual who took a risk and creatively sought opportunities to develop their clinical experience on the premise that the experience was not "supervised." Supervising interns is a hardship on any behavioral health services agency. We must comply with supervision requirements for our paid employees while "contemporaneously" providing gainful clinical experience to our interns. What documentation is available or expected of the employer to determine if clinical experience was supervised vs. unsupervised if the potential employees' educational program does not require it for the degree completion? Why would DBHDS list certain degrees as acceptable in the document entitled Human Services and Related Fields Approved Degrees/Experience if the degree program does not require supervised practicums, internships, or field experiences? This seems like a flawed regulation that should be revisited to realistically classify an individual as QMHP-A, QMHP-C, or QMHP-E based on education and experience of programs that are REQUIRED to have clinical experiences as a graduation requirement. Human capital is the essence of service provision, so hiring people who fit the culture of the agency and the clients we serve will only become more challenging with the current and proposed regulations. Hiring a QMHP-E is often a hardship for many agencies if they do not have a triennial license or DMAS-approved Supervision Training Program. How would a newer agency meet compliance with trying to develop a workforce?

Another HR concern with the proposed regulations is the shift in requiring that Crisis Intervention services are provided by LMHP, LMHP-Supervisee, or LMHP-Resident, or LMHP-RP. Implementation of this regulation would pose hardship and loss of employment to many QMHPs who are currently providing the service. This could potentially create a negative impact on service provision (meaning clients without a much needed service) and gainful employment (similar to what the 2010 regulations did on for so many).

Respectfully Submitted

Ryshonna Stith, MA

---

[8] http://townhall.virginia.gov/L/viewcomments.cfm?commentid=37877

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

79. Hockaday also provided his comment.

80. According to The Commonwealth of Virginia, the changed regulations are *"essential to protect the health, safety, and welfare of Medicaid individuals who require behavioral health services…*these proposed changes are intended to *promote improved quality* of Medicaid-covered behavioral health services provided to individuals. This regulatory action is also essential based upon DMAS' anecdotal knowledge, to ensure that Medicaid individuals and their families are well informed about their behavioral health condition and service options prior to receiving these services. *This ensures the services are medically necessary for the individual and are rendered by providers who do not engage in questionable patient recruitment and sales tactics."*[9]

81. The purpose of the changed regulations is to eliminate the dramatically increased growth in service usage from community based services that provide services to individuals who do not meet the medical necessity criteria and/or have been improperly diagnosed with serious medical illnesses.[10]

82. Instead of adhering to the newly changed laws, NDUTIME intentionally and flagrantly continues to have unqualified employees perform services in violation of the changed regulations in order to defraud the federal government and the Commonwealth to maximize its profits from Medicaid.

---

[9]
http://townhall.virginia.gov/L/GetFile.cfm?File=C:\TownHall\docroot\64\3469\6536\AgencyStatement_DMAS_65 36_v5.pdf at 4-5.
[10] *Id.* at 5-6.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v. NDUTIME Youth & Family Services, Inc., et al.*

25

*Re-Certifications*

83.     Therapeutic day treatment for children and adolescents (service code H0035) covers "a combination of psychotherapeutic interventions combined with evaluation, medication education and management, opportunities to learn and use daily skills and to enhance social and interpersonal skills (e.g., problem solving, anger management, community responsibility, increased impulse control, and appropriate peer relations, etc.) and individual, group, and family counseling offered in programs of two or more hours per day."[11]

84.     In order to be eligible for Medicaid reimbursement, the therapeutic day treatment must meet the specific criteria for medical necessity, diagnostic criteria, at risk criteria, and level of care criteria.[12]

85.     Prior to admission for therapeutic day treatment, a type of LMHP must conduct a service-specific provider intake that documents the individual's diagnosis and describes how the individual meets the criteria.[13]

86.     Instead of conducting re-certifications as required, Thorne instructed Hockaday to falsely fill out the re-certification documents by reviewing the counselor's notes on the patient and make up the re-certification.

87.     Hockaday does not have the requisite qualifications to conduct re-certifications.

88.     Re-certifications must be completed in-person.

---

[11] Virginia Medicaid Community Mental Health Rehabilitative Services, Chapter IV: Covered Services and Limitations, https://www.ecm.virginiamedicaid.dmas.virginia.gov/WorkplaceXT/getContent?vsId={CDA3CAF4-BDBD-4BA5-A6E0-B48DF3DF2A96}&impersonate=true&objectType=document&id={5A94E4AB-2CE5-4D77-9855-C83A312B44F6}&objectStoreName=VAPRODOS1, at 31.
[12] *Id.* at 31-33.
[13] *Id.* at 33.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

26

89.     In order to make it appear as if NDUTIME is performing the re-certifications properly so it can receive payment from Medicaid, Thorne instructs Hockaday to send the completed re-certifications to Shalanda Jackson who signs her name on the re-certifications as if she performed them.

90.     The re-certifications Hockaday completes are submitted to Medicaid for reimbursement with Jackson's signature.

***Overbilling***

91.     Since approximately June 1, 2016, Teshana Henderson instructed NDUTIME's counselors to bill up to sixteen (16) hours of services provided to Medicaid patients per day, regardless of how many hours or minutes of services were actually provided and how many individuals the counselor is treating.

92.     NDUTIME commonly overbills Medicaid for crisis stabilization (procedure code H2019) and crisis intervention (procedure code H0036).

93.     Crisis stabilization services "are direct mental health care to non-hospitalized individuals (of all ages) experiencing an acute crisis of a psychiatric nature that may jeopardize their current community living situation.  The goals are to avert hospitalization or re-hospitalization; provide normative environments with a high assurance of safety and security for crisis intervention; stabilize individuals in psychiatric crisis; and mobilize the resources of the community support system, family members, and others for ongoing maintenance, rehabilitation, and recovery."[14]

---

[14]Virginia Medicaid Community Mental Health Rehabilitative Services, Chapter IV: Covered Services and Limitations, https://www.ecm.virginiamedicaid.dmas.virginia.gov/WorkplaceXT/getContent?vsId={CDA3CAF4-BDBD-4BA5-

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

27

94.     To be eligible for crisis stabilization services, a type of LMHP or Certified Pre-Screener must conduct a face-to-face service specific provider intake, which documents the medical necessity for crisis stabilization services and also meet specific medical necessity criteria.[15]

95.     Crisis stabilization is billed in hourly increments based upon the hour(s) of service actually provided to the individual, which does *not* include room and board, custodial care, and general supervision.[16]

96.     Crisis stabilization services are authorized for up to fifteen (15) consecutive days per crisis episode and limited to sixty (60) days annually.[17]

97.     Crisis stabilization services can be provided by types of LMHPs, QMHPs, or Certified Pre-Screeners.[18]

98.     Crisis intervention services "shall provide immediate mental health care, to assist individuals who are experiencing acute psychiatric dysfunction requiring immediate clinical attention. Crisis intervention services must be available 24 hours a day, seven days per week."[19]

99.     To be eligible for crisis intervention services, a type of LMHP or Certified Pre-Screener must conduct a face-to-face service specific provider intake, which documents the

---

A6E0-B48DF3DF2A96}&impersonate=true&objectType=document&id={5A94E4AB-2CE5-4D77-9855-C83A312B44F6}&objectStoreName=VAPRODOS1, at 60.

[15] *Id.* at 60-61.
[16] *Id.* at 62.
[17] *Id.* at 61.
[18] *Id.*
[19] *Id.* at 55.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

28

medical necessity for crisis stabilization services and level of services needed, and also meet specific medical necessity criteria.[20]

100.    Crisis intervention services are billed in fifteen (15) minute increments based upon the minutes of service actually provided to the individual.[21]

101.    Crisis intervention services are limited to a maximum of 10,800 minutes (160 hours) annually.[22]

102.    Crisis intervention services can *only* be provided by types of LMHPs or Certified Pre-Screeners; Crisis intervention services *cannot* be provided by QMHPs.[23]

103.    NDUTIME overbills for the crisis stabilization and crisis intervention services it provides to individuals.

104.    In order to increase NDUTIME's billing for crisis intervention services, Teshana Henderson has instructed Hockaday to consider any client who is homeless to be classified as in crisis, irrespective of the needs or requirements of the client.

105.    In addition, Teshana Henderson orders NDUTIME to check patients into a hotel for 15 days at a time regardless of whether the patient is homeless or not so as to classify the patient as "non-residential" in order to increase billing.

106.    As of June 1, 2016, Teshana Henderson ordered NDUTIME employees to stop travelling to administer services to patients, instead requiring patients to come to NDUTIME's Richmond, Virginia facility.

---

[20] *Id.* at 56.
[21] *Id.* at 57.
[22] *See id.* at 58.
[23] *Id.* at 56.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

29

107.   When patients come to the Richmond, Virginia facility they are automatically checked into a hotel so as to be classified as "non-residential."

108.   In addition, Teshana Henderson had instructed NDUTIME employees who must travel to and from a patient's location to bill for the travel time as well as pre or post-treatment administrative work as crisis stabilization services.

109.   NDUTIME may only bill for crisis intervention services when a certified LMHP is physically with the patient, and may not bill for travel or administrative time.

110.   Instead of billing Medicaid for actual time spent providing services, NDUTIME inflates its billing in order to maximize its profits.

111.   Often, NDUTIME bills Medicaid for sixteen (16) hours of crisis stabilization services when it is actually only providing a few minutes of services.

**NDUTIME YOUTH AND FAMILY SERVICES, INC.**
Fax # (804) 303-8398
Email To:  ntabon@ndutime.org & thenderson@ndutime.org
Billing Period: June 5th-11th 2016

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crisis Stabilization & Intervention Billing Log/Set Up Sheet | | | | | | | | | | | | | |
| Last Name | First Name | Medicaid # | Date of Birth | Social Security # | ICD-10 Code 10/1/15 | Procedure Code | Sunday 6/5/2016 | Monday 6/6/2016 | Tuesday 6/7/2016 | Wednesday 6/8/2016 | Thursday 6/9/2016 | Friday 6/10/2016 | Saturday 6/11/2016 |
| | Jumika | | | | | H2019 *1 Hr = 1Unit $89 | Stabilizatio n | Stabilizatio n DOA - | Stabilizatio n | Stabilizatio n | Stabilization | Stabilization | Stabilization |
| | | | | | | | 0 | 10 | 16 | 16 | 16 | 0 | 0 |
| | | | | | | H0036 *15 Min = 1Unit $29.79 | Interventio n | Interventio n | Interventio n | Interventio n | Intervention | Intervention | Intervention |
| | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

112.   Often NDUTIME only has one provider assigned to multiple individuals on a day to provide crisis stabilization services. In those situations, instead of billing for the time spent actually rendering services, NDUTIME bills Medicaid for sixteen (16) hours of service for each individual.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

30

113.    In reality, the vast majority of hours billed as either crisis intervention or crisis stabilization are actually for travel, administrative work, or other activities that do not involve providing care to a patient.

114.    In some instances, NDUTIME even has a single provider bill for more hours than there are in a day.

115.    For example, between June 26 to July 2, 2016 when NDUTIME billed Medicaid for crisis stabilization services rendered to Dominique W. and Vernice W., NDUTIME only had one (1) counselor providing services to both individuals.  NDUTIME submitted billing to Medicaid falsely claiming that this counselor provided thirty-two (32) hours of services each day on June 26, June 27, June 29, and June 30, 2016.

**NDUTIME YOUTH AND FAMILY SERVICES, INC.**
Fax # (804) 303-8398
Email To:  ntabon@ndutime.org & thenderson@ndutime.org
Billing Period: June 26th–July 2nd 2016

### Crisis Stabilization & Intervention Billing Log/Set Up Sheet

| First Name | Medicaid # | Date of Birth | Social Security # | ICD-10 Code 10/1/15 | Procedure Code | Sunday 6/26/2016 | Monday 6/27/2016 | Tuesday 6/28/2016 | Wednesday 6/29/2016 | Thursday 6/30/2016 | Friday 7/1/2016 | Saturday 7/2/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| W■ | Dominique | | | | H2019 *1 Hr = 1 Unit $89 | Stabilization 16 | Stabilization 16 | Stabilization 16 | Stabilization 16 | Stabilization 16 | Stabilization 0 | Stabilization 0 |
| | | | | | H0036 *15 Min = 1 Unit $30.79 | Intervention 0 | Intervention 0 | Intervention 0 | Intervention 0 | Intervention 0 | Intervention 0 | Intervention 0 |
| W■ | Vernice | | | | H2019 *1 Hr = 1 Unit $89 | Stabilization 16 | Stabilization DOD-16 | Stabilization 0 | Stabilization DOA-16 | Stabilization 16 | Stabilization 0 | Stabilization 0 |
| | | | | | H0036 *15 Min = 1 Unit $30.79 | Intervention 0 | Intervention 0 | Intervention 1x only | Intervention 0 | Intervention 0 | Intervention 0 | Intervention 0 |

116.    On June 5, 2016, Hockaday raised concerns to Teshana Henderson about how counselors are billing for crisis stabilization and intervention services when counselors do not have any direct interactions with the individual who is supposed to be receiving services and when counselors are not at work.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

31

117.    On June 6, 2016, Teshana Henderson explained to Hockaday that NDUTIME can bill Medicaid for any time a counselor is "available" to an individual even if the individual is not receiving services during those times because "the client is not directly in your face, but you are available to them."

118.    On June 7, 2016, Teshana Henderson held a staff meeting where she directed NDUTIME employees to bill Medicaid not just for the amount of time that services are rendered for individuals receiving crisis stabilization or crisis intervention services, but for the maximum amount of time that can be billed per day for each individual.

On Jun 5, 2016, at 5:30 PM, Michael Hockaday <mhockaday@ndutime.org> wrote:

So I am having a problem wrapping my head around some things in regards to notes for the extra coverage at the hotel. For example, when we have a Counselor there from 4pm – 12am, if they do not have any direct interactions with a client, what are they supposed to put in the note in order to justify billing? OR when they are gone during the day for that matter. For example, apparently Ms. Cosby left earlier today to go with a cousin to "get boxes" and has not been seen since then. (I do not know what time as Ms. Narh only responded to my text to inform me she would not be on time for work tomorrow.....see below) I am not sure what if anything Ms. Narh and/or Barkster were able to do with her but I know Schumann has not had any interventions with her.

And on a different note, I just texted Narh to make sure she was there on time in the morning (8am) as Ms. Green has to get her kids to school. Ms. Narh texted back that not only will she not be there at 8am due to "personal matters" she will also need to leave work around 3-3:30pm. I asked her why she is only saying something about this now since the schedule has been out since Friday and she has not responded. So I will go to the hotel before supervision in order to ensure Ms. Green's kids get to school (She stated that the school "refused" to process her transportation request due to the school year being almost over) and then come to the office.

Respectfully,

*Michael Hockaday, BS, QMHP*
Lead Counselor, Residential Crisis Stablization
NDUTIME Youth & Family Services, Inc.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

32

| | |
|---|---|
| **From:** | Teshana Henderson <thenderson@ndutime.org> |
| **Sent:** | Monday, June 6, 2016 7:09 AM |
| **To:** | Michael Hockaday <mhockaday@ndutime.org> |
| **Cc:** | Shalanda Jackson <SJackson@ndutime.org> |
| **Subject:** | Re: Update on Community Clients |

We discussed this last week, but can do so again today. They are all still in the program and you write as such...

For Example: Although James participated in group, he spent the majority of the day in his room due to being in an irritable state. Counselor checked on him periodically, but Jame asked if he could rest, due to him not wanting to talk to anyone.

Teshana D. Henderson, EdD, LCSW
"Serving & Affirming Families from Within!"

From: Teshana Henderson
Sent: Monday, June 06, 2016 7:11 AM
To: Michael Hockaday <mhockaday@ndutime.org>
Cc: Shalanda Jackson <SJackson@ndutime.org>
Subject: Re: Update on Community Clients

I'm hoping we do not make this complicated for our own understanding. Think about this, when serving in any program, the client is not directly in your face, but you are available to them.

Teshana D. Henderson, EdD, LCSW
"Serving & Affirming Families from Within!"

| | |
|---|---|
| **From:** | Michael Hockaday </o=NYFS/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=mhockaday> |
| **Sent:** | Monday, June 6, 2016 11:03 AM |
| **To:** | Teshana Henderson <thenderson@ndutime.org> |
| **Cc:** | Shalanda Jackson <SJackson@ndutime.org> |
| **Subject:** | RE: Update on Community Clients |

Dr. T,

I completely understand what you are saying and appreciate the clarification, both in this email and at the staff meeting this morning. That being said I am not comfortable with this as I continue to feel this may be stretching the regulations a bit as the examples that you gave for justifying billing outside of face to face time are for residential programs. Please also understand that I in no way am being insubordinate or suggesting that I will not follow your instructions. I just want to express my personal reservations so I feel better. Thank you for your guidance and support.

Also, if you can please clarify when we should draw the line as to compliance with services. Specifically in the case of Ms. Cosby, who was not compliant with established rules on Friday and Sunday. I agree that consideration should be made as to a client's background and history, however at the same time when is enough really enough? Plus from a clinical standpoint are we doing them any good by just allowing them to remain in services when they are not participating and receiving any benefit from it. Like in a hospital, you do have a right to refuse treatment but when you do the hospital doesn't keep you, you're discharged. (I know we're not a hospital but it's the first example I could come up with)

Thank you for your guidance and support.

Respectfully,

*Michael Hockaday,* BS, QMHP
Lead Counselor, Residential Crisis Stablization
NDUTIME Youth & Family Services, Inc.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

***Billing for Crisis Intervention Services Not Rendered by a Licensed Provider***

119.    Crisis intervention services can *only* be provided by types of LMHPs or Certified Pre-Screeners; Crisis intervention services *cannot* be provided by QMHPs.[24]

120.    NDUTIME often has QMHPs or other unqualified employees provide crisis intervention services.

121.    Similar to its service specific provider intake fraud, NDUTIME has a QMHP or other unqualified employee render the crisis intervention services, but then will have an LMHP or Certified Pre-Screener falsely sign the documentation to make it appear that the services were rendered in compliance so that NDUTIME can receive reimbursement from Medicaid for the improperly rendered services.

***Upcoding Fraud***

122.    NDUTIME often admits individuals under crisis intervention and then transitions the individuals to crisis stabilization because NDUTIME can generate more profits by billing Medicaid for crisis stabilization rather than crisis intervention.

123.    Crisis intervention is limited to fifteen (15) consecutive days.

124.    Starting in June 2016, Teshana Henderson required that all patients admitted under crisis intervention be moved into a hotel for fifteen (15) days, so as to classify them as "non-residential" and maximize the amount of time by which NDUTIME can bill for crisis intervention services.

125.    NDUTIME employees no longer travel to treat patients, but instead require all patients to travel to NDUTIME's facility in Richmond.

_____

[24] *Id.* at 56.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

34

126.   If a patient who is not homeless does not live in Richmond and travels to Richmond, they are checked into a hotel for fifteen (15) days and classified as "non-residential."

127.   Often, the individuals that NDUTIME transitions from crisis intervention to crisis stabilization do *not* meet the medical necessity and specified criteria for crisis stabilization services under Medicaid.

128.   To get around this, NDUTIME creates falsified documents, which it submits for reimbursement, purporting to show that the individual meets all of the criteria to receive crisis stabilization services.

129.   Often, the falsified documents are created after the fact, backdated, and are not prepared in compliance with the regulations.

130.   Furthermore, individuals who NDUTIME transitions to crisis stabilization services often do not actually receive crisis stabilization services.

131.   Instead of providing crisis stabilization services, NDUTIME keeps many individuals in the crisis intervention unit, but falsifies documents showing that the individuals moved to crisis stabilization.

132.   For example, NDUTIME admitted Jabar D. to its crisis residential program in April 2015. After fifteen (15) days, NDUTIME transferred him to crisis intervention services and continues to bill for these services for much longer than was medically necessary because Jabar D. did not have a place to live.

133.   Jabar D. received crisis intervention services for approximately one (1) month. However, NDUTIME falsely recorded Jabar D.'s medical charts to note that he was in

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

35

community services instead of crisis intervention services to prevent any red flags during future audits.

134.    For example, Hockaday determined that V.W. no longer met the criteria to continue receiving services, and he emailed Jackson and Teshana Henderson explaining that V.W. no longer met the criteria.  However, Teshana Henderson instructed Hockaday to not only to continue V.W.'s services, but also to transition V.W. to crisis intervention services for one (1) day and then to readmit V.W. to crisis stabilization even though V.W. did not meet the criteria for either.

135.    Teshana Henderson reminded Hockaday twice by email to ensure that he kept the number of individuals receiving crisis services high regardless of whether the services were medically necessary: "It is imperative we as the leadership of the Crisis Team work diligently to ensure we keep our numbers consistently at 3-4 clients to ensure our staff remain continuously working:"

136.    Teshana Henderson has told Hockaday and other NDUTIME employees that NDUTIME is her "cash cow," and as a result high billable hours must be maintained.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

36

-----Original Message-----
From: Michael Hockaday
Sent: Wednesday, June 22, 2016 5:37 PM
To: Shalanda Jackson <SJackson@ndutime.org>; Teshana Henderson <thenderson@ndutime.org>
Subject: Update on Mr W█

According to Ms. Ayala, Ms. W█'s son is not currently interested in coming in to services due to his finding someplace to stay "for the time being". I let Ms. W█know that should things change we would screen him for service eligibility and determine if he is appropriate for our program. Apparently Ms. W█has been the one wanting her son to come in to services and he does not want to. She told me that he told her he can "take care of myself" and so she says she's going to let him. We also talked about her apparent co-dependency as she puts the needs of others before her own needs, her son being a prime example of that. She has spent more time trying to get him in to services than she has trying to find herself a place to live.

Additionally, she continues to be under the impression that she has already been guaranteed an extension per her conversation with Dr. T yesterday. I have not pushed the issue with her much because it would lead to confrontation with her but Ms. Ayala also reiterated to her that extensions are never "guaranteed". My other thoughts on extending her are 2 fold. First, she wasted pretty much her entire first week in services because she insisted that she move in to a house rather than an apartment. We found her multiple places that would accept her voucher and that she could move in to right away and she refused them despite our best encouragement and support. Second, as mentioned multiple times in the past, we need to not simply give people extensions for lack of a housing plan as this will only meet one of the 2 needed criteria. Plus, in the absence of an "acute" psychiatric crisis (hers is chronic), the other criteria are negated anyway. But again, that is just my opinion and as always I will follow whatever instructions are given to me by you guys.


From: Teshana Henderson
Sent: Wednesday, June 22, 2016 6:06 PM
To: Michael Hockaday <mhockaday@ndutime.org>; Shalanda Jackson <SJackson@ndutime.org>
Subject: RE: Update on Mr W█

Good Evening All,

As per my conversation with Mr. Hockaday, Friday is the day Ms. W█will

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

need to go back to the housing office. **As he stated below, her issues meet criteria and if necessary, we will serve her for 1 day in Intervention and then back into Stabilization because her mental health, medical, or housing situation will subside by then. Please remember, finding housing is not a valid reason to discharge a client. Lets ensure we are discharging clients based on them meeting their ISP goals and objectives. It is imperative we as the leadership of the Crisis Team work diligently to ensure we keep our numbers consistently at 3-4 clients to ensure our staff remain continuously working.**

**I believe the Team has done a magnificent job in serving this client and the updates have been great. I sincerely THANK you both for your leadership!**

*Teshana D. Henderson, EdD, LCSW*
**Chief Administrative Officer**
**NDUTIME Youth & Family Services, Inc.**

**RE: Update on Mr W█**
Teshana Henderson

**Sent:** Wednesday, June 22, 2016 6:07 PM
**To:** Michael Hockaday; Shalanda Jackson

Good Evening All,

As per my conversation with Mr. Hockaday, Friday is the day Ms. W█will need to go back to the housing office. As he stated below, her issues meet criteria and if necessary, we will serve her for 1 day in Intervention and then back into Stabilization because her mental health, medical, and housing situation will NOT subside by then. Please remember, finding housing is not a valid reason to discharge a client. Lets ensure we are discharging clients based on them meeting their ISP goals and objectives. It is imperative we as the leadership of the Crisis Team work diligently to ensure we keep our numbers consistently at 3-4 clients to ensure our staff remain continuously working.

I believe the Team has done a magnificent job in serving this client and the updates have been great. I sincerely THANK you both for your leadership!

*Teshana D. Henderson, EdD, LCSW*
**Chief Administrative Officer**
**NDUTIME Youth & Family Services, Inc.**

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v. NDUTIME Youth & Family Services, Inc., et al.*

38

*Medical Necessity Fraud*

137.   Occasionally, NDUTIME will create a completely false basis to admit individuals for services.

138.   For example, in or about July 2015, NDUTIME again admitted Jabar D. to NDUTIME for crisis intervention services because the power in his home went out and he needed a place to stay.

139.   Being without power is not a basis for crisis intervention services under Medicaid.

140.   Jabar D. *did not have any basis* that would meet the required medical necessity, but NDUTIME completely falsified the service specific provider intake to make up a basis that would support receiving services.

141.   Rather than refer Jabar D. to an organization or agency that could assist him, NDUTIME decided to falsely admit him because it viewed the situation as an opportunity to generate more profit from Medicaid without having to provide any services.

142.   Often, NDUTIME bills Medicaid for unnecessary services provided to individuals who have no medical need for services from NDUTIME because the individuals need a place to stay:

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

39



**RE: JHCC**

**"shalanda jackson" [ex:/o=nyfs/ou=exch...**
**To Michael Hockaday**
Dec 14, 2015
**View more**

Right but im banking they will get tired and leave because they never wanted to come into the house anyways they wanted the community

**From:** Michael Hockaday
**Sent:** Monday, December 14, 2015 12:08 PM
**To:** Shalanda Jackson <SJackson@ndutime.org>
**Subject:** RE: JHCC
And that's the other problem. Keeping them just because they have no place to go. We pushed our luck A LOT with Aiden and Jabar and a few others. Our luck will eventually run out but it's not our call so............. J

**From:** Shalanda Jackson
**Sent:** Monday, December 14, 2015 12:06 PM
**To:** Michael Hockaday <mhockaday@ndutime.org>
**Subject:** RE: JHCC
Yeah well I talked to thorne about it today and we can take him to his appointments and I do not see them staying long becasuse they like to be on the go and I also can see us keeping them longer due to no place to go smh

**From:** Michael Hockaday
**Sent:** Monday, December 14, 2015 12:04 PM
**To:** Shalanda Jackson <SJackson@ndutime.org>
**Subject:** RE: JHCC
I think we're asking for trouble but we'll see how it plays out. A lot of liability we're taking on with all those medical issues.

**From:** Shalanda Jackson
**Sent:** Monday, December 14, 2015 11:59 AM
**To:** Michael Hockaday <mhockaday@ndutime.org>
**Subject:** RE: JHCC
Yup Ms. Lee went to go get them

143. As discussed earlier, NDUTIME does not comply with the regulations that require that a type of LMHP or Certified Pre-Screener meet face-to-face with the individual seeking services and complete the service specific provider intake, which documents the individual's medical necessity.

144. A LMHP or Certified Pre-Screener must meet face-to-face with the individual seeking services and complete the service specific provider intake.

145. It is not enough and is not in compliance with the regulations for the LMHP or Certified Pre-Screener to simply sign-off on the service specific provider intake paperwork completed by someone else.

146. Employees who do not hold the requisite licenses, such as Hockaday, perform nearly *all* of the service specific provider intakes for individuals seeking services at NDUTIME.

147. Moreover, Hockaday often supervised between nine (9) and twelve (12) individuals who were not LMHPs or Certified Pre-Screeners, but were nonetheless directed by Teshana Henderson to perform work prohibited by statute.

148. These employees who improperly perform service specific provider intakes in violation of Medicare's requirements *cannot* determine that individuals seeking services at NDUTIME meet the diagnosis criteria or any other medical criteria required to meet the medical necessity requirement of receiving services.

149. As a result, none or very close to none of the services that NDUTIME provides to Medicaid beneficiaries are medically necessary.

*Falsifying Documents for Audits*

150. Whenever Virginia's Department of Medical Assistance Services, Virginia Department of Licensing, or any other entity audits NDUTIME, NDUTIME requires its employees to falsify and shred documents in order to pass the audits.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

41

151.     During Hockaday's employment, each time NDUTIME was audited, NDUTIME organized a team of its employees to work overnight focusing entirely on falsifying and shredding documents to ensure that all required documents are in order for the audit.

152.     Teshana Henderson referred openly in the office about the "shredding parties" that would take place prior to an audit.

### *Retaliation*

153.     On or around December 1, 2016, Hockaday emailed Teshana Henderson stating that he would no longer conduct specific provider intakes, backdate specific provider intake forms, or otherwise engage in practices that Hockaday felt were violations of the law, regardless of whether Teshana Henderson specifically ordered Hockaday to do so.

154.     Hockaday also stated in his email dated on or around December 1, 2016 that he could no longer condone NDUTIME's overbilling of clients and assigning counselors to treat and bill for multiple clients in a single day.

155.     Following Hockaday's email to Teshana Henderson, NDUTIME diminished Hockaday's job duties and threatened Hockaday with termination for refusing to participate in Defendants' fraud.

156.     On or around December 19, 2016, Hockaday resigned from NDUTime due to ongoing retaliation and NDUTime's continuing demands that Hockaday participate in the fraud against the United States and Commonwealth of Virginia.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

42

## COUNT I
### Violations of the Virginia Fraud Against Taxpayers Act
### Va. Code Ann. § 8.01-216.3(A)(1)

157. Relator Hockaday incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

158. The Virginia Fraud Against Taxpayers Act imposes liability on any persons who knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval. Va. Code Ann. § 8.01-216.3(A)(1).

159. Defendants knowingly presented or caused to be presented claims to obtain payment for specific provider intakes that were not properly performed, re-certifications that were not properly performed, services that were medically unnecessary, services that were not properly rendered, upcoding services, overbilling services, and falsely certifying compliance with Medicaid regulations and policies.

160. The result of Defendants' actions has led the Commonwealth to pay for medically unnecessary and improper services, for which Defendants received payments from Medicaid.

161. The Commonwealth has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT II
### Violations of the Virginia Fraud Against Taxpayers Act
### Va. Code Ann. § 8.01-216.3(A)(2)

162. Relator Hockaday incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

43

163.    The Virginia Fraud Against Taxpayers Act imposes liability on any persons who knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval.  Va. Code Ann. § 8.01-216.3(A)(2).

164.    Defendants knowingly made or caused to be made a false record or statement to a false claim when it

      i.    falsified documents to make it appear that licensed employees (LMHPs) were performing services when services were being performed by unlicensed employees;

      ii.    created false narratives to provide services that were medically unnecessary to support overbilling for services, and to support upcoding services.

165.    Defendants knowingly made or caused to be made a false record or statement to a false claim when it falsified documents in response to audits by the government.

166.    The result of Defendants' actions has led the Commonwealth to pay for medically unnecessary and improper services, which Defendants received payments from Medicaid.

167.    The Commonwealth has been damages by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT III
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

168.    Relator Hockaday incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

44

169. The False Claims Act imposes liability on any persons who knowingly present or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

170. Defendants knowingly presented or caused to be presented claims to obtain payment for specific provider intakes that were not properly performed, re-certifications that were not properly performed, services that were medically unnecessary, services that were not properly rendered, upcoded services, overbilled services, and falsely certified compliance with Medicaid regulations and policies.

171. The result of Defendants' actions has led the United States Government to pay for medically unnecessary and improper services, for which Defendants received payments from Medicaid.

172. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT IV
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

173. Relator Hockaday incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

174. The False Claims Act imposes liability on any persons who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v. NDUTIME Youth & Family Services, Inc., et al.*

45

175.   Defendants knowingly made or caused to be made a false record or statement to a false claim when it:

    i.    falsified documents to make it appear that licensed employees (LMHPs) were performing services when services were being performed by unlicensed employees;

    ii.    created false narratives to provide services that were medically unnecessary, to support overbilling for services, and to support upcoding services.

176.   Defendants knowingly made or caused to be made a false record or statement to a false claim when it falsified documents in response to audits by the government.

177.   The result of Defendants' actions has led the United States Government to pay for medically unnecessary and improper services, for which Defendants received payments from Medicaid.

178.   The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT IV
### Violations of the False Claims Act
### 31 U.S.C. § 3730(h)

179.   Relator Hockaday incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

180.   Hockaday is an "employee" and Defendants are "employers" or the principal agents thereof as defined by the False Claims Act.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

46

181.    Defendants have dimished Hockaday's job duties and threatened Hockaday with termination Hockaday because he voluntarily performed lawful acts to investigate one or more violations of the False Claims Act, including questioning Defendants' billing practices and use of unqualified individuals to complete specific provider intakes.

182.    Hockaday engaged in protected activity when he emailed Teshana Henderson stating that he refused to continue completing and/or backdating specific provider intakes and confronted Teshana Henderson about NDUTIME's overbilling practices.

183.    Defendants, knowing that Hockaday engaged in such protected activity, retaliated against Hockaday by threatening him with termination and dismissing his job duties.

184.    On or around December 19, 2016, Hockaday resigned from NDUTime due to ongoing retaliation and NDUTime's continuing demands that Hockaday participate in the fraud against the United States and Commonwealth of Virginia.

185.    Temporal proximity between Hockaday's disclosures and NDUTIME's decision to reduce Hockaday's job duties and threaten him with termination is strongly suggestive of causation.

186.    To redress harms suffered as a result of Defendants' acts and conduct in violation of 31 U.S.C. § 3730(h), Hockaday is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees.

### PRAYER FOR RELIEF

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

Wherefore, Relator Hockaday, acting on behalf and in the name of the United States of America and on his own behalf, prays that judgment will be entered against Defendants NDUTIME Youth and Family Services, Inc., Teshana Henderson and Ellis Henderson for violations of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, *et seq.*, and the False Claims Act, 31 U.S.C. 3729, *et seq.* as follows:

a.  This Court enter judgment against Defendants in an amount equal to three (3) times the amount of damages the Commonwealth has sustained because of the Defendants' actions plus a civil penalty of $5,500 to $11,000 for each act in violations of Va. Code Ann. § 8.01-216.3;

b.  Relator Hockaday be awarded the maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.3, including the costs and expenses of this action and reasonable attorneys' fees;

c.  This Court enter judgment against Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions plus a civil penalty of $21,563 for each act in violation of 31 U.S.C. § 3729;

d.  Relator Hockaday be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

e.  Relator Hockaday be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(h), including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees; and

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.*
*NDUTIME Youth & Family Services, Inc., et al.*

48

f. The Commonwealth, United States Government and Relator Hockaday be awarded all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Hockaday hereby demands a jury trial.

December 20, 2016                         Respectfully Submitted,

_____

R. Scott Oswald, Esq., bar no. 41770
David Scher, Esq., bar no. 47634
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com


Attorneys for *Qui Tam* Plaintiff


CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States of America and The Commonwealth of Virginia ex rel. Michael Hockaday v.
NDUTIME Youth & Family Services, Inc., et al.*